## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

```
_____x
                                     :
GAMECHANGE SOLAR CORP.,              :
                                     :
            Plaintiff,               :
                                     :
                                     :     Court No. 24-00174
       v.                            :
                                     :     PUBLIC VERSION
UNITED STATES,                       :
                                     :
            Defendant.               :
_____x
```

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S<br>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Ned H. Marshak
Jordan C. Kahn*

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
*1201 New York Ave., NW Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiff*
*GameChange Solar Corp.*

Dated: June 11, 2025

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ..................................................................... 1

    A.    Administrative Decision Under Appeal......................................................... 1

    B.    Reasons For Contesting the Administrative Decision ................................... 1

    C.    Issues Presented and Summary of Argument ................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

STANDARD OF REVIEW ............................................................................................ 12

ARGUMENT ................................................................................................................. 13

  I.    LEGAL STANDARD FOR SCOPE RULINGS ............................................... 13

  II.   COMMERCE UNLAWFULLY FOUND THAT GAMECHANGE'S OFF-GRID
       SOLAR CHARGING MODULE DID NOT SATISFY THE CONSUMER GOODS
       EXCLUSION ..................................................................................................... 15

  III.  COMMERCE UNLAWFULLY FOUND THAT GAMECHANGE'S CHARGING
       MODULE DID NOT SATISFY THE OFF-GRID CSPV PANEL EXCLUSION .......... 19

  IV.  COMMERCE UNLAWFULLY FOUND GAMECHANGE'S CHARGING MODULES
       SUBJECT WITHOUT IDENTIFYING SCOPE LANGUAGE OR  PROCEEDING TO
       FURTHER CONSIDERATION UNDER § 351.225(k) ................................................. 27

CONCLUSION.............................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Consol. Edison Co. v. NLRB,*
305 U.S. 197 (1938) ......................................................................................... 12, 18, 21, 22

*Diversified Prods. Corp. v. United States,*
572 F. Supp. 883 (CIT 1983)............................................................................... 8, 14, 29

*Duferco Steel, Inc. v. United States,*
296 F.3d 1087 (Fed. Cir. 2002) ......................................................................... 14, 28, 30

*Gerald Metals, Inc. v. United States,*
132 F.3d 716 (Fed. Cir. 1997) .................................................................................. 12, 18

*Matsushita Elec. Indus. Co. v. United States,*
750 F.2d 927 (Fed. Cir. 1984) ......................................................................................... 12

*Saha Thai Steel Pipe Pub. Co. v. United States,*
101 F.4th 1310 (Fed. Cir. 2024) ............................................................................... 14, 28

*Save Domestic Oil, Inc. v. United States,*
357 F.3d 1278 (Fed. Cir. 2004) ....................................................................................... 12

*SKF USA, Inc. v. United States,*
630 F.3d 1365 (Fed. Cir. 2011) ....................................................................................... 12

*WelCom Prods., Inc. v. United States,*
865 F. Supp. 2d 1340 (CIT 2012)................................................................................... 12

**Regulations**

19 C.F.R. § 251.225 ................................................................................................. *passim*

19 C.F.R. § 351.511 ............................................................................................................ 8

**Statutes**

19 U.S.C. § 1516................................................................................................................ 12

**Administrative Decisions & Publications**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the
People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017
(Dec. 7, 2012).......................................................................................................... 2, 3, 18

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the
People's Republic of China: Amended Final Determination of Sales at Less than Fair
Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dec. 7, 2012) ........... 2, 3, 15, 18

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Changed Circumstances Reviews, and Revocation of the Antidumping and Countervailing Duty Orders, in Part*, 83 Fed. Reg. 65,344 (Dec. 20, 2018).............................................................................................*passim*

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Sept. 20, 2021)........................................................ 13

Plaintiff GameChange Solar Corp. ("GameChange") submits this Memorandum of Law to support its Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

### A.     Administrative Decision Under Appeal

GameChange seeks review of the U.S. Department of Commerce's ("Commerce" or the "Department") Memorandum re: "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Scope Ruling on GameChange Solar Corp.'s Off-grid Solar Charging Module," Case Nos. A-570-979 & C-570-980 (Aug. 13, 2024), C.R. 10, P.R. 21 ("Scope Ruling").

### B.     Reasons For Contesting the Administrative Decision

GameChange's reasons for contesting the administrative decision are set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

### C.     Issues Presented and Summary of Arguments

1.     Whether the Scope Ruling for GameChange's charging module adhered to the legal standard for scope ruling determinations, which by regulation requires that a product only be found subject to ADD/CVD if Commerce can identify applicable plain language, or if not then through consultation to relevant materials and the five factors identified by this Court decades ago.

2.     Whether Commerce unlawfully found that GameChange's charging modules did not satisfy the scope exclusion for certain consumer goods, by misapplying an extra-scope definition, using an inconsistent analytical framework, and ignoring record evidence relating to GameChange's customers and the imported product.

3.     Whether Commerce unlawfully found that GameChange's charging modules did not satisfy the scope exclusion for certain off-grid CSPV panels, by ignoring evidence of criteria

satisfaction, including photographs demonstrating power output, the sizing of visible parallel grid collector metallic wire lines, and retail packaging.

4.      Whether Commerce unlawfully found that GameChange's charging modules are subject to ADD/CVD based solely on the inapplicability of scope exclusions, without either identifying applicable scope language or proceeding to consider relevant materials from the ADD/CVD investigation or record evidence pertaining to the factors recognized by this Court decades ago.

## STATEMENT OF FACTS

In December 2012, Commerce issued antidumping duty ("ADD") and countervailing duty ("CVD") orders on crystalline silicon photovoltaic cells, whether or not assembled into modules ("CSPV cells"), from the People's Republic of China ("China"). *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (Dec. 7, 2012) (collectively, the "ADD/CVD Orders"). The ADD/CVD Orders defined the scope of covered merchandise as follows:

> The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

> This order covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

> Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including,

2

but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of merchandise under consideration are included in the scope of this order.

Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

**Also excluded from the scope of this order are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.**

Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this order; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this order.

Merchandise covered by this order is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020, 8541.40.6030, and 8501.31.8000.3 These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this order is dispositive.

*Id*. at 73,017-19 (emphasis added).

In December 2018, Commerce added a new scope exclusion to the ADD/CVD Orders

with respect to the following off-grid CSPV panels:

**(1) Off grid CSPV panels in rigid form with a glass cover, with the following characteristics:**

**(A) A total power output of 100 watts or less per panel;**

**(B) a maximum surface area of 8,000 cm$^2$ per panel;**

**(C) do not include a built-in inverter;**

**(D) must include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors;**

**(E) must include visible parallel grid collector metallic wire lines every 1-4 millimeters across each solar cell; and**

**(F) must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport);** and

(2) Off grid CSPV panels without a glass cover, with the following characteristics

(A) A total power output of 100 watts or less per panel;

(B) a maximum surface area of 8,000 cm$^2$ per panel;

(C) do not include a built-in inverter;

(D) must include visible parallel grid collector metallic wire lines every 1-4 millimeters across each solar cell; and

(E) each panel is
  1. permanently integrated into a consumer good;
  2. encased in a laminated material without stitching; or
  3. has all of the following characteristics: (i) The panel is encased in sewn fabric with visible stitching, (ii) includes a mesh zippered storage pocket, and (iii) includes a permanently attached wire that terminates in a female USB-A connector.

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Changed Circumstances Reviews, and Revocation of the Antidumping and Countervailing Duty Orders, in Part*, 83 Fed. Reg. 65,344, 65,344-45 (Dec. 20, 2018) ("*CCR Final*") (emphasis added). This exclusion for certain off-grid solar panels was added "based on a lack of interest in the relief provided by the *Orders* with respect to those products." *Id*.

In September 2023, Plaintiff GameChange filed a Scope Ruling Application requesting that Commerce find that its off-grid solar charging module, identified by part number GC4291F, is not subject to the ADD/CVD Orders on CSPV cells from China. GameChange Scope Ruling

4

PUBLIC VERSION

Application (Sept. 14, 2023), C.R. 1, P.R. 1 ("SRA"). In its SRA, GameChange described its off-

grid solar charging module as follows:

> GameChange has provided photographs of the small off-grid solar charging
> module, part number GC4291F, which is the subject of this request. Part number
> **GC4291F are solar-powered charging module of GameChange Solar's
> Genius Tracker, which enables large-scale solar panel racking systems to
> reposition in accordance with the position of the sun**. The dimensions of the
> charging module subject to this request are approximately 185 mm in length and
> 395 mm wide. The cells are 52 mm in length and 79.37 mmm wide. The
> maximum power output for each unit is 60 watts. Each cell contains visible
> metallic lines across the cell. There is no built-in inverter. The small off-grid
> charging modules are exported to the United States in separate packages and sold
> directly and delivered directly to the end users of the solar trackers for which
> these charging modules are designed and used. The individual units that are each
> separately and individually packed are consolidated for transport and are
> protected with four pieces of cardboard on each corner of the individual units.
> Each unit can then easily be separated upon importation for delivery to end-users
> and ultimate installation into solar tracking devices at their final destination. The
> Genius Trackers, of which part number GC4291F is a component, are available
> for sale through GameChange catalogs, in-person and on-line.

*Id*. at 3-4. Reproduced below are the photographs of the front of and back of part number

GC4291F which GameChange submitted to Commerce:

PUBLIC VERSION

[                                                                        ]

*Id*. Exhibit 2.

GameChange further provided marketing materials depicting the Genuis Tracker. *Id*. Exhibit 4. These materials showed the charging module attached to infrastructure that mount and turn solar panels (an actuator and tubing), which together constitute the Genius Tracker. *See id*. The solar panels themselves are purchased separately, are not imported with the Genius Tracker, and are not subject the scope inquiry:



*Id*.

GameChange stated that its small off-grid solar charging modules were excluded from the scope of the ADD/CVD Orders because they satisfied the exclusion for certain off-grid CSPV panels. Specifically, GameChange demonstrated that this imported product, part number GC4291F, constituted an off-grid CSPV panel in rigid form with a glass cover: (1) having a total power output of 100 watts or less per panel; (2) having a maximum surface area of 8,000 cm² per panel; (3) not having a built-in inverter; (4) including a permanently connected wire that

terminates in an 8mm male barrel connector or a two-port rectangular connector with two pins in square housings of different colors; (5) including visible parallel grid collector metallic wire lines every 1-4 millimeters across each solar cell; and (6) in individual retail packaging. *Id*. at 11-12.

GameChange further stated that, to the extent the ADD/CVD Orders' scope plain language was not dispositive, Commerce should nonetheless find its charging module not subject to the ADD/CVD Orders. Based on record information from the underlying ADD/CVD investigations, which constitute relevant sources under 19 C.F.R. § 351.225(k)(1), GameChange demonstrated that its charging module should not be encompassed within the ADD/CVD Orders. *Id*. at 13-15. In particular, GameChange relied upon scope comments seeking an exclusion for off-grid solar modules filed during the investigation by SolarOne® Solutions ("SolarOne"), which were not opposed by Petitioner SolarWorld Industries America Inc. ("Petitioner") or any domestic producer of CSPV cells. *Id*. at 14-15, Exhibit 5.

GameChange also stated that its charging module should not be subject to the ADD/CVD Orders based on the factors set forth in 19 C.F.R. § 351.511(k)(2); *Diversified Prods. Corp. v. United States*, 572 F. Supp. 883, 889 (CIT 1983). Specifically, GameChange demonstrated that the charging module differed from in-scope CSPV cells based on: (1) physical characteristics; (2) expectations of the ultimate users; (3) the ultimate end use of the product; (4) channels of trade; and (5) the manner in which the product is advertised and displayed. *Id*. at 18-20.

In October 2023, Commerce initiated the scope inquiry for GameChange's charging module pursuant to 19 C.F.R. § 251.225(d)(1)(ii). U.S. Department of Commerce Memorandum re: Deemed Initiation of Scope Inquiries (Oct. 17, 2023), P.R. 2. In its initiation, Commerce advised interested parties of their "opportunity to submit comments and factual information to

rebut, clarify, or correct factual information in GameChange's scope ruling application." *Id*. at 2.

No interested party submitted responsive comments or information, and in particular, no

opposition was expressed by Petitioner or any domestic producer of CSPV cells.

In February 2024, Commerce issued GameChange a supplemental questionnaire to which

GameChange responded in March 2024. GameChange Supplemental Questionnaire Response

(Mar. 8, 2024), C.R. 3, P.R. 10 ("SQR"). GameChange clarified that:

> **The Genius Tracker is the brand name given to the solar module by GameChange. As such, referring to one necessarily refer to the other.** As such there is no separate packing or shipping of the module separate from the Genuis Tracker itself. . . .

> The end-users of the Genius Tracker are [
>                         ]. **The function of the Genius Tracker is to position large solar panels to follow the track of the sun across the sky** as detailed in the original scope application submitted by GameChange. **The Genius Tracker does not provide power externally, and its solar panels are designed to make the Genius Tracker self-powered. The Genius Tracker is not connected to the grid.** While it works to position large solar panels, the Genius tracker itself is a small off-grid solar module. [

>           ]

*Id*. at 5-6 (emphases added). GameChange further provided Commerce with the requested

specifications for its charging model:

PUBLIC VERSION

[

]

GameChange in its SQR advised Commerce that its charging module satisfied the

ADD/CVD Orders' exclusion for certain "consumer goods." *Id*. at 6-7. Responding to

Commerce specifically asking to "provide a quotation from the scope, other than the exclusion

language for specific types of off-grid solar modules, which explicitly and unambiguously states

or indicates that all small off-grid solar modules are not covered by the scope," GameChange

stated:

> The scope of the instant Order specifically excludes: "crystalline silicon
> photovoltaic cells, not exceeding 10,000mm2 in surface area, that are
> permanently integrated into a consumer good whose function is other than power
> generation and that consumes the electricity generated by the integrated
> crystalline silicon photovoltaic cell." The Genius Tracker covered by this scope
> application has a cell surface area [
>                        ]. Rather, its solar panels are designed to make the Genius
> Tracker self-powered, thus the small size of the solar cell area. The Genius
> Tracker is not connected to the grid. The Genius Tracker is sold directly to users

and is not contract manufactured for third parties, not sold commercially between GameChange and the end-user, and its purpose is not power generation.

*Id*.

In July 2024, GameChange responded to Commerce's second supplemental questionnaire. GameChange Second Supplemental Response (July 22, 2024), C.R. 5, P.R. 16 ("2SQR"). GameChange submitted information and photographs demonstrating that its charging module satisfied the ADD/CVD Orders' off-grid CSPV panel exclusion. *Id*. at 1-6, Exhibits SSQ1–7. GameChange explained that the "power output of the charging module is intended to only be sufficient to power the movement of the module itself. It is rated [        ], which is the power output it is intended to deliver" *Id*. at 1. That module is the Genius Tracker, and the Genius Tracker is accordingly "a self-powered device and produces no excess power." *Id*. at 2. GameChange also provided photographs showing measurements of the charging module and the packaging of the Genius Tracker. *Id*. Exhibit SSQ3-5. Finally, GameChange clarified that:

> GameChange's SRA seeks a scope ruling on its solar tracker charging module product, the primary part number of which is GC4291F. This product has several variants including [        ] as well as [            ], which are [            ] of the primary part, GC4291F. In all instances, the solar cells, electrical specifications and functionality remain identical.

*Id*. at 7.

In July 2024, Commerce issued GameChange a third supplemental questionnaire to which GameChange responded in August 2024. GameChange Third Supplemental Response (Aug. 5, 2024), C.R. 9, P.R. 20. GameChange provided requested information including, *inter alia*, details concerning the variants of its off-grid solar charging module. *Id*. at 2-3.

In August 2024, Commerce issued its Scope Ruling, determining that GameChange's off-grid solar charging module was covered by the scope of the ADD/CVD Orders. Scope Ruling at 6-13. In reaching this determination, Commerce found the plain language of the scope of the

ADD/CVD Orders to be dispositive. *Id*. at 12. Commerce specifically found that GameChange's off-grid solar charging module did not meet either of the two exclusions upon which GameChange relied. *Id*. GameChange subsequently appealed to this Court. Summons (Sept. 12, 2024), ECF 1; Complaint (Oct. 15, 2024), ECF 6.

## **STANDARD OF REVIEW**

This Court must hold unlawful any portion of Commerce's decisions that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from with conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States,* 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

"Despite Commerce's statutory discretion, . . . if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1372 (Fed. Cir. 2011) (quotation omitted). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *Id*. "If the Department provides 'no reasonable explanation' for changing a practice that it has 'consistently followed,' such a change is an unacceptable agency practice." *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (CIT 2012).

PUBLIC VERSION

## ARGUMENT

### I.     LEGAL STANDARD FOR SCOPE RULING DETERMINATIONS

Commerce conducts scope rulings pursuant to 19 C.F.R. § 351.225.[1] Section (k)(1) of that regulation governs how Commerce is to determine whether a particular requested product is within the scope of the relevant ADD/CVD order. This section states:

> (1) In determining whether a product is covered by the scope of the order at issue, the Secretary will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive.

> (i) The following primary interpretive sources may be taken into account under paragraph (k)(1) introductory text of this section, at the discretion of the Secretary:

>> (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue;

>> (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;

>> (C) Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and

>> (D) Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

> (ii) The Secretary may also consider secondary interpretive sources under paragraph (k)(1) introductory text of this section, such as any other determinations of the Secretary or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence. However, in the event of a conflict between these secondary interpretive sources and the primary interpretive sources under paragraph (k)(1)(i) of this section, the

---

[1]     Commerce's scope regulation, 19 C.F.R. § 351.225, was amended effective November 2021. *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Sept. 20, 2021).

>   primary interpretive sources will normally govern in determining
>   whether a product is covered by the scope of the order at issue.

19 C.F.R. § 351.225(k)(1).

In Commerce's scope analyses, ADD/CVD orders "may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002). The absence of exclusionary language in the scope is not sufficient for Commerce to include an imported article within the scope of an ADD/CVD order. *Id*. at 1097. The scope language of the order is the "cornerstone" of this analysis and "'a predicate for the interpretive process.'" *Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1323 (Fed. Cir. 2024) (quoting *Duferco*, 296 F.3d at 1097). "Although the scope of the order can be clarified, the scope language cannot be interpreted or 'changed in a way contrary to its terms." *Id*. Upon conducting this initial review of the scope language "{i}f the scope language expressly and dispositively resolves whether the subject merchandise falls within or outside of the scope, the scope analysis comes to an end." *Id*.

If the scope language itself does not clearly resolve the inquiry, then Commerce may consult the sources outlined in 19 C.F.R. § 351.225(k)(1). The U.S. Court of Appeals for the Federal Circuit, however, has made clear that "the (k)(1) materials cannot control or alter the scope language of the order" – rather, "they serve as interpretative aids that clarify or support Commerce's understanding of the scope language that Commerce may arrive at upon reviewing the scope language itself." *Id*. at 1325. Finally, if neither the plain language of the scope nor the (k)(1) materials are conclusive, Commerce should proceed to evaluate the five factors identified by this Court in *Diversified Prods.*, 572 F. Supp. at 889, codified in 19 C.F.R. § 351.225(k)(2).

## II.    COMMERCE UNLAWFULLY FOUND THAT GAMECHANGE'S CHARGING MODULE DID NOT SATISFY THE CONSUMER GOODS EXCLUSION

Commerce's decided that GameChange modules are not "permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by" an integrated cell, is not supported by substantial evidence and is otherwise contrary to law. See 77 Fed. Reg. at 73,017-19. Commerce justified this conclusion as follows:

> The . . . exclusion relied upon by GameChange requires that the silicon photovoltaic cells not exceed 10,000 mm$^2$ in surface area and be permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. **Although not defined in the scope, a consumer good is generally defined as "goods that directly satisfy human wants."** Thus, a consumer good is a good that is purchased for consumption and not used later to produce another consumer good. **It is not clear that the solar cells in the solar charging module are integrated into a consumer good** given that the charging module is used to operate the solar modules in the array that produces electricity for consumers. Hence, **we do not find the charging module to be a consumer good**.
>
> **Even if the charging module were considered to be a consumer good, its function is not something other than power generation.** Rather, the charging module's only function is power generation. While GameChange applied the "other than power generation" requirement to the Genius Tracker and claimed that the Genius Tracker's purpose is not power generation, the product under consideration is the charging module used in the Genius Tracker and the only function of the charging module is power generation.

Scope Ruling at 12 (emphases added). The flaws in Commerce's analysis, rendering it unsupported by the requisite substantial evidence, are set forth below.

Commerce employed its own extra-scope definition of consumer goods "as goods that directly satisfy human wants," and which are "purchased for consumption and not later used to produce another consumer good." *Id*. (quoting *Merriam-Webster.com Dictionary*). Commerce then found based on this definition that "{i}t is **not clear that the solar cells in the solar charging module are integrated into a consumer good given that the charging module is used to operate the solar modules in the array that produces electricity** for consumers." *Id*.

15

(emphasis added). Thus, by Commerce's own definition, GameChange's charging modules, in fact, constitute "consumer goods" whose function is other than power generation. In reaching the diametrically opposite conclusion, Commerce ignored evidence demonstrating that the charging module is sold directly to end-users as part of the Genius Tracker, a standalone product that "assist{s} solar racking systems to change position along with the movement of the sun across the sky." SRA at 1.

Specifically, Commerce disregarded GameChange's statements that the Genius Tracker is sold directly to end-users who are [                                                  ]. SQR at 5-6. In response to Commerce's first supplemental questionnaire, GameChange explained:

> **The Genius Tracker is the brand name given to the solar module by GameChange. As such, referring to one necessarily refers to the other.** As such, there is no separate packing or shipping of a solar modules separate from the Genius Tracker itself. The marketing materials provided . . . clearly demonstrate this with the use of the brand name "Genius Tracker."

SQR at 5 (emphasis added) (citing SQR Exhibit S1).

GameChange in particular advised Commerce that "{t}he **Genius Tracker is sold directly to users** and is not contract manufactured for third parties, **not sold commercially between GameChange and the end-user, and its purpose is not power generation**." *Id*. at 6-7 (emphases added). The charging module is permanently integrated into the Genius Tracker, as demonstrated by GameChange's marketing materials. *See* SRA Exhibit 4. The charging module "directly satisfies {the} wants" of these customers by enabling their separately-purchased solar panels to track the sun. Scope Ruling at 12 (quoting *Merriam-Webster.com Dictionary*). Thus, the Genius Tracker is purchased for consumption by GameChange's customers, [                                                  ], and accordingly not later used for consumption to generate power from the solar panels used in conjunction with the Genius Tracker. The fact that electricity is ultimately generated from solar panels that are not part of the Genius Tracker does not

16

undermine the qualifying criterion that a charging module is purchased by GameChange customers for both consumption and a function other than power generation.

Commerce also ignored record evidence that the Genius Tracker is "**not used later to produce another consumer good**." Final Scope Ruling at 12 (emphasis added). GameChange's customers merely use the Genius Tracker to "assist solar racking systems to change position along with the movement of the sun across the sky." SRA at 1. While the Genius Tracker is connected to solar racking systems, it is "**not connected to the grid**" and "**does not provide power externally**." SQR at 6-7 (emphases added). In other words, the Genius Tracker is not a part of "the array that produces electricity for consumers." Scope Ruling at 12. The Genius Tracker is a standalone consumer product that "assists solar racking systems to change position along with the movement of the sun across the sky." SRA at 1. Therefore, Commerce's finding that GameChange's charging module is not a consumer good is unsupported by substantial evidence.

Moreover, Commerce initially analyzed whether the Genius Tracker in its entirety is a consumer good but then focused more narrowly on the charging module in assessing whether its function is something other than power generation. *See* Scope Ruling at 12. As the record reveals, the charging module necessarily refers to the Genius Tracker because it is sold directly to end-users as part of the Genius Tracker. SQR at 5. While Commerce correctly points out that the "the product under consideration is the charging module used in the Genius Tracker and the only function of the charging module is power generation," Scope Ruling at 12, Commerce's analysis should have analyzed whether the function of the Genius Tracker is power generation. Commerce's inconsistent analysis that toggles between the charging module proper and the

17

larger Genius Tracker in a strained effort to find the consumer good exclusion inapplicable renders the Scope Ruling unsupported by substantial evidence.

Accordingly, GameChange correctly applied the "other than power generation" requirement to the Genius Tracker rather than the charging module itself. The consumer good exclusion of the ADD/CVD Orders excludes "crystalline silicon photovoltaic cells . . . integrated into a consumer good whose function is other than power generation." ADD/CVD Orders, 77 Fed. Reg. at 73,017-19. Commerce's finding that GameChange's charging module did not qualify is unsupported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison,* 305 U.S. at 217. In particular, Commerce erred by neglecting to consider record evidence concerning GameChange customers, the purpose of the Genius Tracker, and the fact that the charging module neither produces external electricity nor is connected to the grid. Commerce therefore improperly found the consumer product scope exclusion inapplicable "without taking into account contradictory evidence or evidence from with conflicting inferences could be drawn." *Gerald Metals,* 132 F.3d at 720.

Finally, as Commerce notes, the term "consumer good" is "not defined in the scope" of the ADD/CVD Orders. Scope Ruling at 12. Given this ambiguity presented by the scope language, if Commerce's own definition of consumer good does not definitely resolve whether GameChange's off-grid solar charging module is a consumer good, Commerce should have conducted an analysis of the (k)(1) sources and (k)(2) factors under 19 C.F.R. § 351.225. Section IV, *infra*. Commerce improperly declined to consider the (k)(1) materials and (k)(2) factors, which it was required to do, since the term "consumer goods" is not defined in the scope. *See* Scope Ruling at 12.

### III.    COMMERCE UNLAWFULLY FOUND THAT GAMECHANGE'S CHARGING MODULE DID NOT SATISFY THE OFF-GRID CSPV PANEL EXCLUSION

A second, alternative, reason why GameChange's charging modules are excluded from

the ADD/CVD Orders is because they fall with the exclusion for "Off grid CSPV panels in

rigid form with a glass cover, with the following characteristics":

> (A) A total power output of 100 watts or less per panel;
>
> (B) a maximum surface area of 8,000 cm$^2$ per panel;
>
> (C) do not include a built-in inverter;
>
> (D) must include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors;
>
> (E) must include visible parallel grid collector metallic wire lines every 1-4 millimeters across each solar cell; and
>
> (F) must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport).

*CCR Final*, 83 Fed. Reg. 65,344-45.

It is undisputed and apparent from the photographs submitted by GameChange that the

solar charging module "is a small off-grid" module that consists of CSPV panels in rigid form

with a glass cover. *Id*.; SRA at 6, Exhibits 2, 4; Scope Ruling at 8. It is further undisputed that

GameChange's charging module "do{es} not include a built-in inverter." *Id*.; SRA at 3.

Commerce found that GameChange's charging module did not qualify for the off-grid exclusion

based on its findings that GameChange failed to demonstrate satisfaction of all the other criteria.

Scope Ruling at 8-11. As set forth below, Commerce's findings with respect to these other

criteria render its Scope Ruling unsupported by substantial evidence.

According to Commerce, "the record is unclear regarding the upper range of power

produced by the charging module." Scope Ruling at 8. Commerce, however, concedes that

19

"GameChange provided a photograph of the label on its charging module, which has the

following specification: [                                        ]. *Id*. This photograph is reproduced

below:

[                                                                    ]

SRA Exhibit 3.

Despite this clear label, Commerce found that "it appears that the solar charging module produce in excess of [   ] watts of power." Scope Ruling at 8. Commerce reached this conclusion based on the specification stating [                                      ]. *Id*. (quoting SQR Exhibit 2). When questioned about this apparent discrepancy, GameChange reported that the charging module "is a self-powered device and **produces no excess power** . . . **The power requirement is [      ]**." SQR at 2 (emphases added). GameChange provided further confirmation in the form of its label on the product exported by [                                      ], identifying "the [                                      ] 2SQR at 2, Exhibit SSQ2b (emphasis added). In short, the record confirms that the charging module has a total power output of [   ] watts, and the record is devoid of any indicia that its power output exceeded 100 watts per panel. Commerce's finding that GameChange's charging module did not qualify for the off-grid exclusion based on the power output criterion is therefore not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison,* 305 U.S. at 217.

GameChange early on advised Commerce that: "The cells include visible parallel metallic grid collector lines at less than 4 mm intervals." SRA at 12. In response to Commerce's specific request to "submit a high resolution close-up photograph of the solar panel with a metric ruler," GameChange provided images, including the following:

[                                                                                              ]

2SQRR at 2, Exhibit SSQ3. Commerce decided that this image was insufficient to satisfy the metallic grid collector line criterion:

> GameChange appears to be measuring either the distance between the busbars (*i.e.*, the thick silver vertical lines) or the distance between the shorter thinner vertical lines shown above, rather than the distance between the horizontal lines, which are the lines that have a thickness and position consistent with those of the parallel grid collector metallic wire lines identified in the scope exclusion.

Scope Ruling at 9.

Commerce's refusal to find that GameChange's charging module had visible parallel metallic grid collector lines at less than 4 mm intervals is unsupported by substantial evidence. This photograph clearly confirmed that the visible metallic grid collector lines at the left of the ruler demonstrably appear "every 1-4 millimeters across each solar cell." *CCR Final*, 83 Fed. Reg. 65,344-45; *see* 2SQRR Exhibit SSQ3. Given these photographs and the absence of any contrary evidence, Commerce's finding that GameChange's charging module did not qualify for the off-grid exclusion based on the metallic line spacing criterion is not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison,* 305 U.S. at 217.

GameChange advised Commerce that "each unit is in individual retail packaging." SRA at 12. Specifically, the charging module "is separately packed for transport with cardboard on each corner and includes a label with the GameChange logo, the product's name and features." *Id*. at 12. The SRA included "photographs of the Genuis Tracker packaging for transportation . . . These photos show individual Genius Trackers that are packed for delivery and palletized together for international transportation." SQR at 4, SRA Exhibit 2. In response to a subsequent supplemental questionnaire, GameChange reported that: "GameChange ships the charging modules as shown in the photos . . . . GameChange will cover the charging modules with corrugated cardboard for increased protection. Nevertheless, **the charging modules are sold as**

**packaged upon import**." 2SQR at 5 (emphasis added). "Additional photos of the packaging"

provided by GameChange included the following pictures:

[

]

*Id*. Exhibit SSQ5a.

Notwithstanding this evidence, Commerce found that GameChange did not satisfy the

retail packaging criterion:

{R}ecord evidence does not show that each charging module is individual packed for retail sale with GameChange's logo and information regarding the product features on the packaging. Rather, record evidence shows that multiple charging modules are packed together and strapped with banding, covered with cardboard, and shrink wrapped with a packing list with bar codes and certain information on it attached to the outside of the cardboard.

Moreover, the examples in the scope of what is included in retail packaging (*i.e.*, graphics and a description of product features), indicate that **products in retail packaging are generally packaged for sale to the ultimate consumers of the product**, as it is logical to conclude that graphics present the product in an appealing way and are designed to catch the customer's eye. Additionally, **a description of product features on the packaging** serves to inform the customer about the product and ultimately encourage a sale. None of these characteristics are present in the packaging used by GameChange's charging module.

Additionally, "retail" refers to the sale of goods in relatively small quantities for use or **consumption rather than for resale**. GameChange's charging modules are not individually packaged for retail sale, but rather, are shipped as one part of a larger product, the Genius Tracker, which is sold to [

], rather than the public in relatively small quantities.

Scope Ruling at 11 (emphases added).

Commerce's conclusion that GameChange's charging module did not satisfy the retail packaging criterion is unsupported by substantial evidence. It is undisputed that GameChange's customers, [                                        ], use multiple charging modules in their Genius Tracker "to position large solar panels to track the sun across the sky." SQR at 5, Exhibit S1. It is further undisputed that: "[

]" *Id*. at 6 (emphasis added).

Thus, these photographs clearly show that the charging module: (1) is "packaged for sale to the ultimate consumers of the product"; (2) has "information regarding the product features on the packaging"; and (3) is sold for "consumption rather than for resale." Scope Ruling at 11. The packaging clearly states "Part description: Charging Module" and contains detailed information including "PV Module." 2SRA Exhibit SSQ5a. While there are no graphics or product

descriptions, *see id.*, those features are only "typical{}," and not required to qualify for the exclusion, and in fact GameChange's packaging undisputably includes other exemplars of "the product name . . and foam for transport." *CCR Final*, 83 Fed. Reg. 65,344-45. Contrary to Commerce's decision, this criterion neither requires sale to "the public in relatively small quantities" nor does it become inapplicable merely because the charging module is "shipped as one part of a larger product, the Genius Tracker." Scope Ruling at 11. Commerce's interpretation of the scope language adds a criterion that is not part of the exclusion and improperly disregards the fact that GameChange sells to customers to whom "the charging modules are sold as packaged upon import." 2SQR at 5.

Commerce likewise engaged in a flawed analysis to find that GameChange's charging modules did not have "a maximum surface area of 8,000 cm$^2$ per panel." *CCR Final*, 83 Fed. Reg. 65,344-45. GameChange reported that "the surface area of the cells for each is approximately [          ]" SQR at 2. Commerce belabors the point that it repeatedly requested "specification sheets and brochures or advertising materials showing the exact dimensions of each solar panel." Scope Ruling at 9-10. In response, Commerce was advised that "GameChange does not have specification sheets or advertising materials beyond those provided to the Department and available on GameChange's website." 2SQR at 1. To confirm its representations, GameChange provided Commerce with "detailed photographs with measurements of the solar panels incorporated into the charging module, part number GC4291F." *Id.* Exhibit SSQ-1. Commerce dismissed these photographs as neither making "clear what is being measured" nor "how the photographs support the reported dimensions." Scope Ruling at 10. Yet even if this Court agrees with the Department's conclusion, Commerce does not identify record evidence contradicting GameChange's representation that this criterion has

PUBLIC VERSION

been satisfied. And as discussed, the record evidence that that "the surface area of the cells for each is approximately [          ]" SQR at 2.

Finally, Commerce found that GameChange's charging module did not "include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors." *CCR Final*, 83 Fed. Reg. 65,344-45. Commerce emphasizes the "GameChange confirm{ation} that the connector {used in its charging module} is [  ], which is preferable to the 8mm barrel connector due to the weather resistance offered by the [  ] connector for the outdoor use of the charging module, part number GC4291F." Scope Ruling at 11 (quoting 2SQR at 4). While GameChange acknowledges that its connector is not technically an 8mm barrel connector, this fact does not constitute sufficient reason for this Court to affirm Commerce's decision. Commerce's reasoning is flawed with respect to all of the other factors detailed above, and the minor difference in the size of the connector is not, standing alone, sufficient reason for Commerce to have decided that the exclusion does not apply. Thus, assuming *arguendo* that this Court agrees with GameChange's position with respect to the other characteristics, it should remand Commerce's decision to the agency for further analysis.

Moreover, GameChange's charging module satisfies the consumer goods exclusion, Section II, *supra*, and Commerce improperly found the product to be subject merchandise without either identifying applicable scope language or proceeding to further consideration pursuant to 19 C.F.R. § 351.225(k). Section IV, *infra*.

## IV. COMMERCE UNLAWFULLY FOUND GAMECHANGE'S CHARGING MODULES SUBJECT WITHOUT IDENTIFYING SCOPE LANGUAGE OR PROCEEDING TO FURTHER CONSIDERATION UNDER § 351.225(k)

Commerce found "the plain language of the scope of the Orders to be dispositive with respect to whether the charging module is covered by the *Orders*." Scope Ruling at 7. However,

Commerce's analysis merely analyzed two scope exclusions and did not identify specific scope language through which the charging module would be otherwise subject. *See id.* at 7-12. The absence of exclusionary language in the scope is not sufficient for Commerce to include an imported article within the scope of an ADD/CVD order. *Duferco*, 296 F.3d at 1097. The closest that Commerce comes to meeting this critical requirement is to state:

> it is clear that the scope of the *Orders* cover off-grid solar modules, as explicit exclusions have been added to the scope for specific types of off-grid solar modules. If the scope did not cover off-grid solar modules, there would be no need to add exclusions for specific types of off-grid solar modules to the scope.

*Id*. at 12.

Such circular reasoning is devoid of the necessary identification of plain scope language necessary to find GameChange's charging module subject to the ADD/CVD Orders. Noting that other off-grid modules were excluded falls short of identifying the scope language "that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco*, 296 F.3d at 1089. The scope language of the order is the "cornerstone" of this analysis and "'a predicate for the interpretive process.'" *Saha Thai*, 101 F.4th at 1323 (quoting *Duferco*, 296 F.3d at 1097). In accordance with this legal prerequisite, this Court should order remand for Commerce to identify specific scope language covering GameChange's charging module. Unless and until such language can be identified and judicially confirmed, Commerce remains obligated to proceed with further analysis under 19 C.F.R. § 351.225(k). In terms of (k)(1) sources, Commerce should consider the investigation materials through which SolarOne sought an exclusion for off-grid panels, which domestic producers of CSPV cells did not oppose. Commerce only declined to specifically grant the exclusion because SolarOne omitted information relating to the (k)(2) criteria. SRA at 14-15, Exhibit 5. Commerce should have

considered these (k)(1) sources, which confirm that GameChange's product is "more akin to the off-grid panels with which Petitioner have expressed no objection." SRA at 15.

Finally, Commerce should have proceeded to analyze the (k)(2) factors. These *Diversified Prods*. considerations became central under the regulatory structure because: Commerce did not identify specifically applicable scope language; and the (k)(1) sources did not definitively resolve the question of scope applicability. 19 C.F.R. § 351.225(k). GameChange provided evidence demonstrating that its charging modules should not be found with the scope based on: (1) physical characteristics; (2) expectations of the ultimate users; (3) the ultimate end use of the product; (4) channels of trade; and (5) the manner in which the product is advertised and displayed. *Id*. at 18-20. In response, Commerce summarily dismissed two of these factors as follows: "customers expect to use, and do use, solar modules covered by the *Orders* to generate power, which is no different from customers' expectations for, and uses of, GameChange's charging module." Scope Ruling at 12. Commerce in making these findings ignored the evidence presented by GameChange with respect to such expectations and use:

> The expectations of the ultimate purchasers of large-scale solar panel are entirely different from the expectations of GameChange Solar's customers. **GameChange Solar's customers purchase the solar tracking unit, which assists the movement of solar panel racks to enable them to follow the path of the Sun across the sky.** GameChange Solar's customers are not purchasing the small off-grid solar charging module separately, for use separate from the Genuis Tracker of which it is part. Rather part number GC4291F is integrated into the Genuis Tracker tracker unit, which is what the customer purchases. . . .
>
> **The ultimate use of the small off-grid solar charging module is the provide power to the Genuis Tracker unit that enables the movement of solar panel racks in order to track the Sun across the sky**. The small off-grid solar charging modules are not designed nor are suitable for uses independent of the Genuis Tracker.

SRA at 17 (emphases added).

Commerce's response to GameChange's position that the "use" factor is not satisfied is unsupported by substantial evidence because GameChange "customers expect to use, and do use," the charging module to track the sun, which differs from the ordinary use of solar panels "to generate power." Scope Ruling at 12. Further, Commerce declined altogether to address GameChange's arguments concerning the channels of trade and advertising/display criteria. *Compare* SRA at 17 *with* Scope Ruling at 12. With respect to the "physical characteristics" criterion where GameChange demonstrated that its charging modules "are different than the in-scope merchandise," SRA at 16, Commerce simply reverted to its overarching finding: "GameChange has not demonstrated that the charging modules meets any of the{e} exclusions." Scope Ruling at 12.

Finally, it is axiomatic that the absence of exclusionary language in the scope is not sufficient for Commerce to include an imported article within the scope of an ADD/CVD order. *Duferco*, 296 F.3d at 1097. This Court should order remand because Commerce's scope exclusion findings are unsupported by substantial evidence. Sections II, III, *supra*. Moreover Commerce cannot lawfully conclude that the charging module is in-scope through mere reference to inapplicable scope exclusions – as it improperly did in its Scope Ruling.

## **CONCLUSION**

GameChange respectfully requests that this Court find Commerce's Scope Ruling unsupported by substantial evidence and otherwise not in accordance with law, and accordingly remand the Scope Ruling to Commerce with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

PUBLIC VERSION

_/s/ Jordan C. Kahn_
Ned H. Marshak
Jordan C. Kahn*

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
        **
*1201 New York Ave., NW Suite 650
Washington, DC 20005
(202) 783-6881

_Counsel for Plaintiff_
_GameChange Solar Corp._

Dated: June 11, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law In Support of its Motion for Judgment on the Agency Record, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 7,716 words, less than the 14,000 word limit.

*/s/ Jordan C. Kahn*
Jordan Kahn

*Counsel for Plaintiff*
*GameChange Solar Corp.*

Dated: June 11, 2025