IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| GAMECHANGE SOLAR CORP., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Court No. 24-00174 <br><br> PUBLIC VERSION <br><br> Business Proprietary Information has been deleted from Pages 13, 14, 15, 16, 17, 18, 19, and 20 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL

JACK DUNKELMAN
Attorney
Office of the Chief Counsel for Trade
    Enforcement & Compliance
U.S. Department of Commerce

KRISTIN E. OLSON
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-6299
kristin.olson@usdoj.gov

*Attorneys for the United States*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

STATEMENT PURSUANT TO RULE 56.2 ............................................................. 1

    I.    The Administrative Determination Under Review ................................. 1

    II.    Issues Presented for Review .................................................................. 1

STATEMENT OF FACTS ........................................................................................ 2

SUMMARY OF THE ARGUMENT ....................................................................... 6

ARGUMENT ........................................................................................................... 7

    I.    Standard Of Review ............................................................................... 7

    II.    Legal Framework For Scope Rulings .................................................... 7

    III.    Commerce's Determination That GameChange's Charging Modules Are Covered by the Scope of the Orders Is Supported by Substantial Evidence and Is Otherwise in Accordance With Law ................................. 9

        A.    Commerce Lawfully Found GameChange's Charging Modules Subject To The Orders Pursuant To 19 C.F.R. 351.225(k) ...................... 10

        B.    Commerce Properly Determined that the Charging Modules Do Not Meet The Off-Grid CSPV Panel Exclusion ....................................... 12

        C.    Commerce Properly Determined that the Charging Modules Did Not Meet The Consumer Goods Exclusion ............................................... 21

CONCLUSION ...................................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

Cases

*Atl. Sugar, Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984)................................................................7

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938)................................................................7

*Duferco Steel, Inc. v. United States,*
  296 F.3d 1087 (Fed. Cir. 2002)................................................................10

*Fedmet Res. Corp. v. United States,*
  755 F.3d 912 (Fed. Cir. 2014)................................................................9

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996)................................................................7

*Matsushita Elec. Indus. Co. v. United States,*
  750 F.2d 927 (Fed. Cir. 1984)................................................................7

*Meridian Prod., LLC v. United States,*
  851 F.3d 1375 (Fed. Cir. 2017)................................................................7, 9

*Nippon Steel Corp. v. U.S.,*
  458 F.3d 1345 (Fed. Cir. 2006)................................................................23

*Sango Int'l L.P. v. United States,*
  484 F.3d 1371 (Fed. Cir. 2007)................................................................8

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States,*
  776 F.3d 1351 (Fed. Cir. 2015)................................................................8

*Tak Fat Trading Co. v. United States,*
  396 F.3d 1378 (Fed. Cir. 2005)................................................................8

*United Steel & Fasteners, Inc. v. United States,*
  947 F.3d 794 (Fed. Cir. 2020)................................................................9

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951)................................................................7

Statutes

19 U.S.C. § 1673e(a)(2)................................................................7

<u>Regulations</u>

19 C.F.R. 351.225(k) ................................................................................................. i, 8, 10

19 C.F.R. § 351.225 ...................................................................................................... 7, 9

19 C.F.R. § 351.225(a) .................................................................................................... 7

19 C.F.R. § 351.225(e) .................................................................................................... 8

19 C.F.R. § 351.225(k)(1) .................................................................................... 5, 8, 11, 17

19 C.F.R. § 351.225(k)(2) ....................................................................................... 5, 6, 9

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021). .................................... 8

<u>Administrative Decisions & Publications</u>

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dec. 7,2012)............................................ 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled intoModules from the People's Republic of China: Countervailing Duty Order, 77 Fed. Reg. 73,017 (Dec. 7,2012)*............... 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Changed Circumstances Reviews, and Revocation of the Antidumping and Countervailing Duty Orders, in Part, 83 Fed. Reg. 65*...... 3

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, GameChange Solar Corp. (GameChange).  GameChange challenges three issues from the Department of Commerce's (Commerce) final scope ruling finding that the off-grid solar charging module that GameChange imports is within the scope of the antidumping (AD) and countervailing duty (CVD) orders (Orders) on crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells), from the People's Republic of China (China).  Because the final scope ruling is supported by substantial evidence and otherwise in accordance with law, we respectfully request that the Court reject plaintiff's challenge, sustain the final scope ruling, and enter judgment in favor of the United States.

STATEMENT PURSUANT TO RULE 56.2

## I.    The Administrative Determination Under Review

GameChange challenges the final scope ruling issued on August 13, 2024, concerning solar cells from China.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China* (Aug. 13, 2024) (C.R. 10, P.R. 21) (final scope ruling).

## II.    Issues Presented for Review

1.    Whether Commerce's determination that GameChange's charging modules are subject to the Orders is supported by substantial evidence and is otherwise in accordance with law.

2.    Whether Commerce lawfully found that GameChange's charging modules did not satisfy the scope exclusion for certain off-grid crystalline silicon photovoltaic panels.

3.    Whether Commerce lawfully found that GameChange's charging modules did not satisfy the scope exclusion for certain consumer goods.

**STATEMENT OF FACTS**

In December 2012, Commerce issued the antidumping duty and countervailing duty orders on crystalline photovoltaic cells, whether or not assembled into modules (solar cells), from the People's Republic of China.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (Dec. 7, 2012) (collectively, the Orders).

The merchandise covered by the Orders is crystalline silicon photovoltaic (CSPV) cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels, and building integrated materials. Orders at 73,017-19.  The Orders cover crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and to forward the electricity that is generated by the cell.  *Id.*

The scope of the Orders contains a number of exclusions.  Relevant to this case, the scope excludes "crystalline silicon photovoltaic cells, not exceeding $10,000_{mm2}$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. When more than one cell is permanently integrated into a consumer good, the surface area for

purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good." *Id.* at 73,017-19.

In December 2018, Commerce also excluded certain off-grid CSPV panels from the scope of the Orders:

> (1) Off grid CSPV panels in rigid form with a glass cover, with the following characteristics:
>
> (A) A total power output of 100 watts or less per panel;
>
> (B) a maximum surface area of 8,000 $cm^2$ per panel;
>
> (C) do not include a built-in inverter;
>
> (D) must include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors;
>
> (E) must include visible parallel grid collector metallic wire lines every 1-4 millimeters across each solar cell; and
>
> (F) must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport) . . . .

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Changed Circumstances Reviews, and Revocation of the Antidumping and Countervailing Duty Orders, in Part*, 83 Fed. Reg. 65,344, 65,344-45 (Dec. 20, 2018). This exclusion was added after an importer of the subject merchandise requested changed circumstances reviews and revocation, in part, of the Orders, with respect to certain off-grid solar panels. *Id.* at 65,344. The producers accounting for substantially all of the production of the domestic like product to which the Orders pertained lacked interest in the relief provided by the Orders with respect to these off-grid solar panels. *Id.*

On September 14, 2023, GameChange Solar Corp. (GameChange) requested that

Commerce conduct a scope inquiry regarding whether the charging module GameChange

imports into the United States is covered by the scope of the Orders.  *See* GameChange Scope

Ruling Application (September 14, 2023) (C.R. 1, P.R. 1) (Scope Ruling Application).

GameChange described the product subject to its request as follows:

> GameChange Solar has provided photographs of the small off-grid
> solar charging module, part number GC4291F, which is the subject
> to this request.  Part number GC4291F are solar-powered charging
> module of GameChange Solar's Genius Tracker, which enables
> large-scale solar panel racking systems to reposition in accordance
> with the position of the sun.  The dimensions of the charging
> module subject to this request are approximately 1855 mm in
> length and 395 mm wide.  The cells are 52 mm in length and 79.37
> mm wide. The maximum power output for each unit is 60 watts.
> Each cell contains visible metallic lines across the cell. There is no
> built-in inverter.  The small off-grid charging modules are exported
> to the United States in separate packages and sold and delivered
> directly to the to end users of the solar trackers for which these
> charging modules are designed and used.  The individual units that
> are each separately and individually packed are consolidated for
> transport and are protected with four pieces of cardboard on each
> corner of the individual units.  Each unit can then easily be
> separated upon importation for delivery to end-users and ultimate
> installation into solar tracking devices at their final destination.
> The Genius Trackers, of which part number GC4291F is a
> component, are available for sale through GameChange catalogs,
> in-person and on-line.

Scope Ruling Application at 3-4.

GameChange asserted that its off-grid solar charging module, part number GC4291F

(charging module), possessed the characteristics to meet the exclusion for certain off-grid CSPV

Panels.  *Id.* at 11-12.  Namely, GameChange argued that its charging modules had the following

characteristics:  (1) A total power output of 100 watts or less per panel; (2) a maximum surface

area of 8,000 cm2 per panel; (3) not having a built-in inverter; (4) a permanently connected wire

that terminates in an 8mm male barrel connector or a two-port rectangular connector with two

pins in square housings of different colors; (5) visible parallel grid collector metallic wire lines every 1-4 millimeters across each solar cell; and (6) individual retail packaging. *Id.*

GameChange further asserted that, if the plain language of the scope does not definitively establish that its charging modules are excluded or that the scope is otherwise ambiguous, Commerce must further conduct analysis under 19 C.F.R. § 351.225(k)(1). Scope Ruling Application at 13. Specifically, GameChange stated that its charging modules are distinguishable from those described in the scope language, and referenced a request filed during the investigation by SolarOne Solutions (SolarOne), which was ultimately not adopted by Commerce, to exclude off-grid solar panels from the scope of the Orders. Scope Ruling Application at 14-15. GameChange argued, in the alternative, that its charging modules are not subject to the Orders based on the factors in 19 C.F.R. § 351.225(k)(2). Scope Ruling Application at 16.

In October 2023, Commerce accepted GameChange's Scope Ruling Application and deemed the scope inquiry initiated pursuant to 19 C.F.R. § 351.225(d)(1)(iii). *See* Memorandum, "Deemed Initiation of Scope Inquiry" (October 17, 2023) (P.R. 2). In February and July 2024, Commerce requested additional information from GameChange regarding its scope application. *See* Request for Additional Information (February 8, 2024) (C.R. 2, P.R. 4) (First Supplemental Questionnaire); Scope Inquiry Regarding Solar Charging Module GC4291F - Request for Additional Information (July 5, 2024) (C.R. 4, P.R. 12) (Second Supplemental Questionnaire); Scope Inquiry Regarding Solar Charging Module GC4291F - Request for Additional Information (Dept' of Commerce July 30, 2024) (C.R. 8, P.R. 19) (Third Supplemental Questionnaire). GameChange responded on March 8, July 22, and August 5, 2024, respectively. *See* GameChange Supplemental Questionnaire Response (March 8, 2024)

(C.R. 3, P.R. 10) (1SQR); GameChange Second Supplemental Questionnaire Response (July 22, 2024) (C.R. 5, P.R. 16) (2SQR); GameChange Third Supplemental Questionnaire Response (August 5, 2024) (C.R. 9, P.R. 20) (3SQR).  In its first supplemental questionnaire response, GameChange stated that its charging module met an additional exclusion in the Orders covering certain consumer goods.  1SQR at 6-7.

On August 13, 2024, Commerce issued its final scope ruling, determining that GameChange imported charging modules are covered by the scope of the Orders.  *See* Final Scope Ruling.  In particular, Commerce found the plain language of the scope of the Orders to be dispositive with respect to whether the charging module is covered by the Orders.  Final Scope Ruling at 7.  Furthermore, Commerce determined that GameChange's charging modules are not covered by the two exclusions relied upon by GameChange.  *Id.*

## SUMMARY OF THE ARGUMENT

Commerce's determination that GameChange's imported charging modules are within the scope of the Orders is lawful and supported by substantial evidence.  Commerce reasonably determined, based on the plain language of the scope of the Orders, that GameChange's charging modules are covered.  Furthermore, Commerce's determinations that GameChange's charging modules do not meet either of two exclusions is supported by substantial evidence.  First, Commerce determined that the charging modules do not meet the exclusion covering Off-Grid CSPV Panels because the record does not show that the charging modules (1) have a total output of 100 watts or less, (2) have visible parallel grid collector metallic wire lines every 1-4 millimeter across each solar cell, (3) have the required surface area, (4) have the required wire connector type, and (5) are in individual retail packaging.  Further, Commerce determined that the charging modules do not meet the consumer good exclusion because the record does not

show that the CSPV cells are integrated into a consumer good whose function is other than power generation.

## ARGUMENT

### I.    Standard Of Review

In reviewing Commerce's antidumping determinations, the Court sustains "'any determination, finding, or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (citing 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" is "more than a mere scintilla" of relevant and reasonable evidence, *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (citation omitted).

### II.    Legal Framework For Scope Rulings

When Commerce publishes an AD or CVD order, it defines the scope and "includes a description of the subject merchandise, in such detail as {Commerce} deems necessary." 19 U.S.C. § 1673e(a)(2). Commerce is often called upon to determine whether a certain product is included within the scope of an AD or CVD order because it must write scope language in general terms. 19 C.F.R. § 351.225(a); *see also Meridian Prod., LLC v. United States*, 851 F.3d 1375, 1379 (Fed. Cir. 2017). When Commerce confronts such a question, it follows the analytical framework and procedures set forth in its regulations. 19 C.F.R. § 351.225; *see also*

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) ("There is no specific statutory provision governing the interpretation of the scope of {AD} or {CVD} orders.").

In 2021, Commerce amended its regulation for answering scope questions. *See* 19 C.F.R. § 351.225(k); *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,322-23 (Dep't of Commerce Sept. 20, 2021). Pursuant to the amended regulation, to determine whether a product is covered by the scope of an order, Commerce "may make its determination" on the basis of the language of the scope alone. 19 C.F.R. § 351.225(k)(1) (emphasis added). However, in making this determination, Commerce has discretion to consider the (k)(1) sources, including the primary interpretive sources under (k)(1)(i), such as the petition and initial investigation pertaining to the order at issue, previous determinations by Commerce (including prior scope rulings), and International Trade Commission (ITC) reports pertaining to the order at issue. *Id.* Commerce may also consider the secondary interpretive sources under (k)(1)(ii) such as "any other determinations of {Commerce} or the {ITC} not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence." *See* 19 C.F.R. § 351.225(k)(1)(ii). To the extent such secondary sources conflict with the primary sources, however, the primary sources "will normally govern." *Id.*

If Commerce determines that descriptions of the merchandise contained in the (k)(1) sources are dispositive, Commerce issues a final scope ruling regarding whether the product falls within the order's scope. *See* 19 C.F.R. § 351.225(e); *see also Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). The (k)(1) sources are "dispositive" when they "definitively answer the scope question." *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1379

(Fed. Cir. 2007).  The Court reviews "Commerce's analysis of the (k)(1) sources against the product in question" as an issue of fact under the substantial evidence standard.  *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020); *see also Meridian Prod.*, 851 F.3d at 1382 (citing *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 919-22 (Fed. Cir. 2014)).  Only when the (k)(1) sources are not dispositive will Commerce consider the five criteria set forth in § 351.225(k)(2).  *See* 19 C.F.R. § 351.225(k)(2); *Fedmet Res. Corp.*, 755 F.3d at 918.  These factors include: "(A) the physical characteristics of the merchandise; (B) expectations of the ultimate purchasers; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2)(i).

### III.    Commerce's Determination That GameChange's Charging Modules Are Covered by the Scope of the Orders Is Supported by Substantial Evidence and Is Otherwise in Accordance With Law

Commerce's determination that GameChange's charging modules are within the scope of the Orders is supported by substantial evidence and is otherwise in accordance with law. GameChange's claim that Commerce misapplied the regulatory framework is incorrect and overlooks Commerce's analysis of the record evidence in accordance with 19 C.F.R. § 351.225, which demonstrates that GameChange's charging module is subject to the scope of the Orders. Commerce properly determined that the plain language of the scope of the Orders is dispositive and considered the plain language in making its determination.  Further, because Commerce found the scope language dispositive, additional analysis under 19 C.F.R. § 351.225(k)(2) is not necessary.

A.      **Commerce Lawfully Found GameChange's Charging Modules Subject To The Orders Pursuant To 19 C.F.R. 351.225(k)**

The plain language of the scope of the Orders includes GameChange's charging modules. *See Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) ("Scope orders may be interpreted as including merchandise only if they contain language that specifically includes merchandise or may be reasonably interpreted to include it."). The scope of the Orders broadly covers CSPV cells, and modules, laminates, and panels, consisting of CSPV cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels, and building integrated materials. Final Scope Ruling at 2. GameChange's scope request covers its solar-powered charging module which incorporates solar cells. Scope Ruling Application at 3. In short, the product at issue is a module that consists of CSPV cells, and therefore Commerce rationally found "the plain language of the scope of the *Orders* to be dispositive with respect to whether the charging module is covered by the *Orders*." Final Scope Ruling at 7. Commerce proceeded to focus its analysis primarily on whether GameChange's charging modules met one of the specific exclusions.

Although GameChange's charging modules fall within the scope's description, GameChange argues that Commerce, in focusing on the exclusions, "did not identify specific scope language through which the charging module would be otherwise subject." Pl. Br. 27-28. But GameChange itself, in its scope ruling application, questionnaire responses, and before this Court, fails to present any compelling argument or explanation as to why its charging modules are out of scope. *See, e.g.*, Scope Ruling Application at 10-18; 1SQR at 6-7. The burden is on interested parties to explain why merchandise should be found in or out of scope. *See* 19 C.F.R. § 351.225(c)(2)(viii)(A). In its scope ruling application, GameChange made only the bare assertion that "the unambiguous language of the scope does not include the small off-grid solar

charging modules imported by {GameChange}." Scope Ruling Application at 13.  The

remainder of its application pertains to the exclusionary language of the scope.  In the absence of

a more fulsome argument, GameChange's emphasis on the language of the scope exclusions

implicitly suggests that GameChange believes its merchandise to be covered by the non-

exclusionary scope language.  In any case, GameChange has not at any time presented its own

argument as to why its charging modules are not covered by the non-exclusionary scope

language.  Commerce was not obligated to make a scope determination beyond what

GameChange raised in its application.  *See* 19 C.F.R. § 351.225(c)(2)(viii)(A).

GameChange further argues that, because Commerce allegedly did not identify specific

scope language covering GameChange's charging module, a (k)(2) analysis, rather than an

analysis of the plain language of the scope under (k)(1), is appropriate.  Pl. Br. 29.  Although

GameChange may allege that a (k)(2) analysis is appropriate to determine whether merchandise

is *excluded* from the scope, it does not argue or explain why its merchandise is not covered by

the plain language of the scope in the first instance.  Therefore, even if a (k)(2) analysis were

appropriate to analyze whether GameChange's charging modules fall within one of the

exclusions delineated in the scope, applying the (k)(2) analysis to the scope language in its

entirety would not be appropriate.

As an initial matter, 19 C.F.R. § 351.225(k)(1) provides that when determining whether a

product is covered by the scope of the order at issue, Commerce will consider the language of the

scope and *may make its determination on this basis alone* if the language of the scope, including

the descriptions of merchandise expressly excluded from the scope, is dispositive.  Furthermore,

19 C.F.R. § 351.225(k)(1)(i) provides that Commerce "may," but is not required to, take into

account several enumerated primary interpretive sources.  In the Final Scope Ruling, Commerce

found that the plain language of the scope is dispositive, and therefore, did not analyze the (k)(1) or (k)(2) factors and was not required to do so.  Final Scope Ruling at 7.

During the scope inquiry, GameChange contended that its charging modules are expressly excluded from the scope and argued further that, if Commerce found that the charging modules are not described by the exclusion, they are nonetheless distinguishable from large-on grid panels and therefore are not within the scope.  *See* Scope Ruling Application at 17; *see also* Pl. Br. at 29.  GameChange supported its latter argument by citing the fact that during the course of the initial investigation that led to the Orders, petitioners did not comment on a request from SolarOne arguing that off-grid solar panels should be excluded from the Orders.  Scope Ruling Application at 14-15.  However, as Commerce explains in its Final Scope Ruling, it is clear that the scope of the Orders covers off-grid solar modules generally because explicit exclusions have been added to the scope for specific types of off-grid solar modules (which GameChange in any case does not meet).  Final Scope Ruling at 12.  If the scope did not cover off-grid solar modules, there would be no need to add exclusions for specific types of off-grid solar modules to the scope.  *Id.*

Commerce rationally found that GameChange's charging module met the plain language of the scope, which established the universe of covered products.  In its submissions, GameChange argued that its charging module qualifies for the off-grid CSPV panel exclusion and the consumer goods exclusion.  *See* Scope Ruling Application at 11-12; 1SQR at 6-7. Therefore, Commerce focused its analysis on those two exclusions.

### B.    Commerce Properly Determined that the Charging Modules Do Not Meet The Off-Grid CSPV Panel Exclusion

Commerce correctly determined that GameChange's charging modules do not meet the exclusion of Off-Grid CSPV Panels because the charging modules did not meet several of the

criteria enumerated by the exclusion.  Final Scope Ruling at 7-11.  The exclusion covers off grid CSPV panels in rigid form with a glass cover that meet all of the following characteristics: (1) have a total power output of 100 watts or less; (2) have a maximum surface area of 8,000 square centimeters per module; (3) do not have a built-in inverter; (4) have a permanently connected wire that terminates in either an 8mm male barrel connector or a two-port rectangular connector with two pins in square housings of different colors; (5) have visible parallel grid collector metallic wire lines every 1-4 millimeters across each solar cell; and (6) be packaged in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport).  Final Scope Ruling at 3, 7.  Commerce does not dispute that GameChange's charging modules have a glass cover and lack a built-in inverter, but the record shows that the charging modules do not meet the other requirements of the exclusion.  Final Scope Ruling at 7-11.  All criteria of the exclusion must be met to qualify for the exclusion, and thus, if the Court agrees with Commerce that even one of the exclusion's elements is not met, Commerce's determination should be sustained.  *Id.* at 7.

    First, Commerce found that the record does not show that the charging modules have a total output of 100 watts or less.  Final Scope Ruling at 8.  Although GameChange in its Scope Ruling Application initially provided a photograph of a label on its charging module, that indicates                                    , Scope Ruling Application at Exhibit 3, the specification sheet provided in the first supplemental questionnaire response at Exhibit S2 states                                which indicates that the power could          .  *Id.* at 8.  In its second supplemental questionnaire response, GameChange responds to Commerce's inquiry into this discrepancy by stating that:  "{i}t is rated as          , which is the power output it is

13

intended to deliver.  As power can vary with solar panels depending upon a number of factors, the power output for which the tracker is designed is identified as the minimum. . . . Excess power output, to the extent there would be any, would be unutilized as no power is fed into external components."  Final Scope Ruling at 8 (citing 2SQR 1-2).  Though GameChange reported that excess power could be produced above [    ] watts, there is no evidence on the record demonstrating definitively the amount of excess power that could be produced.  Final Scope Ruling at 8.  Therefore, the record does not establish that GameChange's charging modules have a total output of 100 watts or less.

Second, Commerce determined that the record does not show that the charging modules have "visible parallel grid collector metallic wire lines every 1-4 millimeter across each solar cell" as required by the exclusion.  Final Scope Ruling at 8.  Commerce requested that GameChange submit a high-resolution close-up photograph of the solar panel with a metric ruler that shows the parallel grid collector metallic wire lines and the number of millimeters between the metallic wire lines.  *Id.* at 8; First Supplemental Questionnaire at 3.  In response, GameChange provided a specification sheet that did not clarify the distance between collector lines and did not contain the requested high-resolution close-up photograph of the solar panel with a metric ruler.  1SQR at 3 and Exhibit 2.

After a further request for information, GameChange did ultimately provide the requested photographs.  2SQR at 3 and Exhibit SSQ3.  However, the photographs do not show visible parallel grid collector metallic wire lines every 1-4 millimeter across each solar cell.  Final Scope Ruling at 8-9.  GameChange appears to have measured the busbars (*i.e.* the thick silver vertical lines) or the distance between the shorter thinner vertical lines, rather than the distance between the horizontal lines, which have a position consistent with those of the parallel grid collector

14

material wire lines identified in the scope exclusion.  *Id.* at 8 and attachment.  The relevant

language in the scope exclusion refers to "wire lines every 1-4 millimeter across each solar cell,"

meaning that the distance between the lines should be no less than 1mm and no more than 4mm.

GameChange failed to directly measure the distance between these lines.  *See* 2SQR at Exhibit

SSQ3.  Notably, GameChange does not address in its brief that its photographs did not provide a

measurement as requested.  *See generally* Pl. Br.  Accordingly, because GameChange failed to

establish that the distance between the relevant metallic wire lines is inside of the 1-4mm range,

GameChange's product does not meet this element of the scope exclusion.

Third, Commerce found that GameChange never clearly and accurately identified the

surface area of the solar panels in the charging area.  Final Scope Ruling at 9.  GameChange

initially reported that "{t}he small off-grid solar charging modules subject to this scope ruling

application are approximately                                                  ."  Final Scope Ruling at 9

(citing Scope Ruling Application at 19.)  Subsequently, Commerce further requested

"specification sheets and brochures or advertising material showing the exact dimensions of each

solar panel."  *Id.* (citing First Questionnaire at 2).  In its first supplemental questionnaire

response, GameChange reported that the "solar module has two configuration options, the

surface area of the cells for each are:                                               ."  Thus,

GameChange reported that the surface area of the cells for each is approximately             .

*Id.* at 9 (citing 1SQR at 2).  However, the specifications in Exhibit S2 lack the dimensions of the

solar panels in the charging module.  Final Scope Ruling at 9.

Seeking further clarification, Commerce again requested that GameChange "provide

specification sheets and brochures, or advertising materials, showing the exact dimensions of

each solar panel in GameChange's solar charging module, part number GC4291F."  *Id.* at 10

(citing Second Questionnaire).  In response, GameChange stated:  "{w}hile GameChange does not have specification sheets or advertising materials beyond those provided to the Department and available on GameChange's website, we have attached as Exhibit SSQ-1 detailed photographs with measurements of the solar panels incorporated into the charging module, part number GC4291F."  *Id.* (citing 2SQR at 1).  However, the photographs provided in 2SQR Exhibit SSQ-1 are unclear as to what they are measuring to support the dimensions GameChange Reported.  Final Scope Ruling at 10.  Commerce found that the dimensions reported are for a single solar cell rather than the length dimensions of the solar panels, which is what Commerce twice requested.  *Id.*

Fourth, Commerce determined that the charging modules do not meet the requirement in the exclusion that the panels must include a permanently connected wire that terminates in either (1) an 8mm male barrel connector or (2) a two-port rectangular connector with two square pins in square housings of different colors.  Final Scope Ruling at 10-11.  GameChange initially stated that its charging modules "include a connecting wire that terminates in a 8mm barrel connector."  Final Scope Ruling at 11 (citing Scope Ruling Application at 12).  However, Commerce observed in its second questionnaire that exhibit 2 of GameChange's 1SQR contained the following line item:

Second Supplemental Questionnaire at 4.  To resolve the incongruity regarding the type of connector, Commerce requested that GameChange explain why the connectors used in the charging module are the same type and size connector as an 8mm barrel connector.  *Id* at 5.

GameChange responded that "that the connector {used in its charging module} is          , which is preferable to the 8mm barrel connector due to the weather resistance offered by the connector for the outdoor use of the charging module, Part Number GC4291F."  Final

Scope Ruling at 11 (citing to 2SQR at 4).  In that response, GameChange elaborated that this

updated response was confirmed with its                                    .  2SQR at 4.  GameChange's

response indicates that the          connector is distinguishable from an 8mm barrel connector.

Accordingly, Commerce determined that the charging module does not meet the requirement of

having a permanently connected wire that terminates in an 8mm barrel connector.  Final Scope

Ruling at 11.  Furthermore, in the underlying scope inquiry, GameChange did not claim, nor did

it provide evidence to demonstrate, that the charging module has a permanently connected wire

that terminates in a two-port rectangular connector with two pins in square housings of different

colors.  *Id*.  Accordingly, Commerce determined that GameChange's charging modules did not

include a type of connector requirement by the CSPV panel exclusion.  *Id.*

     In its brief, GameChange does not argue that its charging module included either of the

connectors required by the exclusion language.  *See generally* Pl. Br.  GameChange does not

dispute that its charging module lacks a two-port rectangular connector with two pins in square

housings of different colors.  *See generally id.*  Furthermore, GameChange concedes in its brief

that its          connector is not an 8mm barrel connector.  *Id.* at 27.  In an effort to deflect from the

record evidence, GameChange attempts to characterize the difference in the size of its connector

as "minor" such that is not sufficient for Commerce to decide the exclusion does not apply.  *Id.*

at 27.  GameChange offers no further explanation as to why this difference is "minor,"

particularly when the plain language of the scope exclusion controls.  *Id.*; *see* 19 C.F.R.

§ 351.225(k)(1).  Indeed, contrary GameChange's contention, an 8mm connector (or a two-port

rectangular connector enumerated specifications) is an integral part of the scope exclusion.

     GameChange additionally argues that the difference in the size of the connector alone is

not sufficient to find that the exclusion does not apply.  *Id.*  However, GameChange has the logic

of the exclusion exactly backwards.  The exclusion covering off grid CSPV panels enumerates several characteristics in a list, joined together using the conjunctive word "and."  Therefore, to meet the exclusion, the product must be a CSPV panel in rigid form with a glass cover meeting all of the enumerated characteristics.  *Id.* at 7.  As explained above, the record shows that the GameChange's charging module does not meet at least one of the enumerated characteristics:  it does not include a permanently connected wire that terminates in either an 8mm male barrel connector or a two-port rectangular connector with two pins in square housings of different colors.

Fifth, Commerce found that record evidence does not show that each charging module is in individual retail packaging as required by the exclusion.  Final Scope Ruling at 11.  As an initial matter, the record does not show that the solar modules are individually packaged.  *Id.* Despite GameChange's initial claim that "each unit is in individual retail packaging," *see* Scope Ruling Application at 12, photos subsequently submitted by GameChange show that, rather than being individually packaged, multiple charging modules are packed together, strapped with banding, covered with cardboard, and shrink wrapped with a

.  *Id.* (citing 2SQR at 6 and Exhibit SSQ5a).  GameChange argues that the charging modules are sold as "packaged upon import" but does not explain the meaning of that phrase, its significance, or why it satisfies the requirement of "individual retail packaging" as used in the scope.  Pl. Br. at 22-23 (citing 2SQR at 5).  Nonetheless, the pictures provided by GameChange plainly do not show individually packaged units.  *See id.*

The scope exclusion states that retail packaging "typically includes graphics, the product name, its description and/or features, and foam for transport."  Final Scope Ruling at 11.

18

GameChange's submitted photographs do not show features that are typical of "retail packaging." *Id.* Specifically, the packaging lacks graphics and product descriptions, a fact which itself GameChange concedes. *See* Final Scope Ruling at 11; Pl. Br. at 25.

GameChange argues that, despite the fact that its packaging lacks some indicia of retail packaging, its packaging includes other indicia: the product name and foam for transport. *Id.* at 25. However, other than a bare assertion that the packaging of the charging modules "undisputably" includes "foam for transport," GameChange does not identify evidence on the record to support that claim. Indeed, in its questionnaire responses, GameChange explains that the charging modules are packed, consolidated, and palletized[1] with no reference to foam for transport. *See* Pl. Br. at 22; Scope Ruling Application at 5, 9; 1SQR at 4. Additionally, GameChange states that corrugated cardboard, not foam, is used to cover and protect its charging modules. Pl. Br. at 22; 2SQR at 5-6. Furthermore, the photographs that GameChange provides clearly show that the charging modules are covered in cardboard and do not show any foam. *See* Scope Ruling Application at Exhibit 2; 1SQR at Exhibit S3; 2SQR at Exhibit SSQ5a; *see also* Final Scope Ruling at 11.

With regard to the packaging including the product name, the photographs provided by GameChange reflect that a label on the packaging indicates                    . 2SQR at

---

[1] The verb "palletize" means to place on, transport, or store by means of pallets. https://www.merriam-webster.com/dictionary/palletize. A "pallet" is a portable platform for handling, storing, or moving materials and packages (as in warehouses, factories, or vehicles). Other definitions variously refer to a pallet as a "wood flat-bladed instrument," a "straw-filled tick or mattress," or a "small, hard, or temporary bed." No definitions indicate that a pallet is made of foam. https://www.merriam-webster.com/dictionary/pallets.

Exhibit SSQ5a.  To the extent that this is the proper product name,[2] the packaging nonetheless does not include graphics, a description of the product and/or its features, and foam for transport. Thus, the packaging does not include a majority of elements that the scope exclusion states are typical for retail packaging for the purposes of this provision of the exclusion.

Further, the definition of "retail" is the "sale of commodities or goods in small quantities to ultimate consumers." *Merriam-Webster.com Dictionary*, "Retail," retrieved August 13, 2024, https://www.merriamwebster.com/dictionary/retail.  As Commerce explained, it is logical to conclude that retail packaging would include features, *i.e.* the enumerated elements (graphics, the product name, and the description and/or features of the product), that would present the product in an appealing way, designed to catch the customer's eye. *Id.* In light of these enumerated elements, "retail packaging" would be akin to packaging that one would see in a retail store where products are presented with packaging including identifying names, graphics, and descriptive information so that consumers can easily recognize and understand the product.  By contrast, the packaging for GameChange's charging module is limited merely to a cardboard box with a plain white label identifying product name.  2SQR at Exhibit SSQ5a.  Such minimal, utilitarian packaging is not representative of retail packaging in line with the language of the exclusion and in line with common sense.

Commerce rationally determined that GameChange's charging modules did not meet five of the requirements to qualify for the off-grid CSPV panel exclusion.  All criteria of the

---

[2] GameChange's scope application is for part number GC4291F, which is                                    in 2SQR Exhibit SSQ5a.  GameChange states that although the primary part number, which is referenced in the Scope Ruling Application, is GC4291F, the product has several variants including                        as well as                            .  It is unclear if the packaging includes the product name for all variants because the photograph in Exhibit SSQ5a only shows a label for                    .

exclusion must be met to qualify for the exclusion.  And even if only one of the requirements were not satisfied, the Court should sustain Commerce's determination.

### C.    Commerce Properly Determined that the Charging Modules Did Not Meet The Consumer Goods Exclusion

Commerce correctly determined that GameChange's charging modules did not meet the consumer goods exclusion because they do not meet one of the exclusion's requirements.  To meet this exclusion, the cells must (1) not exceed 10,000mm2 in surface area, (2) be permanently integrated into a consumer good whose function is other than power generation, and (3) consume the electricity generated by the integrated crystalline silicon photovoltaic cell.  Final Scope Ruling at 2.  To meet the exclusion, all elements must be met.

As an initial matter, Commerce correctly determined that GameChange's charging modules were not permanently integrated into a "consumer good."  Commerce relied on the definition of a consumer good as "goods that directly satisfy human wants" and further explained that a consumer good is a good that is purchased for consumption and not used later to produce another consumer good.  Final Scope Ruling at 12.  Commerce determined that the charging module, into which the cells are integrated, is not a consumer good because the charging module is used to operate the solar modules in the array that produces electricity for consumers.  *Id.*

Furthermore, Commerce explained that even if the charging module could be considered a consumer good, its function is not something other than power generation.  *Id.*  Commerce found that the product under consideration is the charging module itself used in the genius tracker and that the charging module's only function is power generation.  *Id.*  GameChange does not dispute that the charging module is the product under consideration.  Pl. Br. at 17.  However, GameChange argues that Commerce's analysis should have focused on whether the

function of the Genius Tracker is power generation, rather than the function of the charging

module. *Id.* at 17-18.

However, a plain reading of the scope exclusion defeats GameChange's contention. The

exclusion covers solar cells permanently integrated into a consumer good whose function is other

than power generation. Final Scope Ruling at 2, 17. Therefore, the key inquiry is (1) into what

consumer good are the solar cells integrated, and (2) is the function of that consumer good

something other than power generation. GameChange's Scope Ruling Application explicitly

states that the scope ruling covers their small off-grid solar charging modules and that the solar

cells are integrated into that charging module. Scope Ruling Application at 2-3, 16. Assuming,

*arguendo*, that the charging module is a consumer good, the proper inquiry is to determine what

the function of the charging module and not the GeniusTracker as a whole, as is suggested by

GameChange. Pl. Br. at 18.

The record shows that the function of the charging module is power generation. *Id.* at 12.

In its scope ruling application, GameChange repeatedly states that the function of the charging

modules is to power GameChange Solar's Genius Tracker solar tracking device. Scope Ruling

Application at 5-7. GameChange confuses Commerce's analysis in reference to the following

sentence in Commerce's finding that "{it} is not clear that the solar cells in the solar charging

module are integrated into a consumer good given that the charging module is used to operate the

solar modules in the array that produces electricity for consumers." Pl. Br. at 15 (citing Final

Scope Ruling at 12. GameChange attempts to twist this sentence to show that Commerce finds

the charging modules to have a function other than power generation. This sentence is

complimentary to Commerce's subsequent analysis that the function of the charging modules is

power generation. Indeed, the solar tracking device cannot operate without the power generated

by the charging module.  Commerce correctly determined that the function of the charging

module is power generation, and even if it is possible to draw two inconsistent conclusions from

evidence in the record, that does not preclude Commerce's determinations from being supported

by substantial evidence.  *Nippon Steel Corp. v. U.S.*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).

**CONCLUSION**

      For these reasons, we respectfully request that the Court sustain Commerce's final results

in their entirety, deny plaintiff's motion for judgment on the administrative record, and enter

judgment in favor of the United States.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>BRETT A. SHUMATE<br>Assistant Attorney General</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>REGINALD T. BLADES, JR.<br>Assistant Director</td></tr>
<tr><td>OF COUNSEL</td><td>s/ Kristin E. Olson</td></tr>
<tr><td></td><td>KRISTIN E. OLSON</td></tr>
<tr><td>JACK DUNKELMAN</td><td>Trial Attorney</td></tr>
<tr><td>Attorney</td><td>U.S. Department of Justice</td></tr>
<tr><td>Office of the Chief Counsel for Trade</td><td>Civil Division</td></tr>
<tr><td>   Enforcement & Compliance</td><td>Commercial Litigation Branch</td></tr>
<tr><td>U.S. Department of Commerce</td><td>P.O. Box 480</td></tr>
<tr><td></td><td>Ben Franklin Station</td></tr>
<tr><td></td><td>Washington, D.C. 20044</td></tr>
<tr><td></td><td>Tel: (202) 307-6299</td></tr>
<tr><td></td><td>kristin.olson@usdoj.gov</td></tr>
<tr><td></td><td></td></tr>
<tr><td>February 20, 2026</td><td>*Attorneys for the United States*</td></tr>
</table>

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the 14,000 word limitation authorized by the Court's scheduling order because the brief contains 6,846 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

s/ Kristin E. Olson _____